440 P.2d 911

**STATE of Arizona, Appellee,**

v.

**Theodis MILES, Appellant.**

**No. 1786.**

Supreme Court of Arizona.

In Banc.

May 8, 1968.

Darrell F. Smith, Atty. Gen., by Charles S. Pierson, Asst. Atty. Gen., and Robert K. Corbin, Maricopa County Atty., Phoenix, for appellee.

Vernon B. Croaff, Public Defender, by Grant Laney, Deputy Public Defender, Phoenix, for appellant.

UDALL, Vice Chief Justice.

The appellant, Theodis Miles, hereinafter referred to as defendant, was charged with committing the crime of murder, allegedly on April 30, 1966. At his trial in the Superior Court of Maricopa County beginning November 16, 1966, the jury returned a verdict of murder in the first degree, and fixed the penalty at death. The sentence of death was imposed by the court, and from its judgment the defendant appealed.

The facts are as follows: The defendant, with a number of his acquaintances, went to the home of Frances Watson in the little community of Allenville, approximately two miles south of the town of Buckeye in Maricopa County, Arizona, on the evening of April 30, 1966, for the purpose of playing cards and gambling. During the evening he asked Frances Watson for two dollars, and while she did not flat-

ly refuse to give him the money, there was some hesitation and dispute that occurred, whereupon the defendant struck Frances Watson with his fist and became exceedingly angry.

Thereafter one of the witnesses remonstrated with the defendant and defendant pulled out his gun and fired one shot. Anna Ruth Finley, the daughter of Frances Watson, and one or two companions immediately came into the room. The daughter inquired as to what was happening and defendant thereupon fatally shot Anna Ruth Finley one or more times. The defendant then turned his attention to the mother, Frances Watson, and is alleged to have stated: "I have been wanting to kill you for a long time; now this is the time." He then took the pistol in both hands and fatally shot Frances Watson two or more times.

The next morning, when officers came looking for the defendant, he readily gave himself up and stated that he didn't remember anything that had happened the night before. There was some evidence that defendant and his associate had been drinking during the evening, the defendant claiming that he was so drunk he didn't know what he was doing, whereas other witnesses to the incident testified that the defendant didn't appear to be excessively drunk.

Since the facts and circumstances connected with the killing of both victims were the same, the two informations filed against the defendant were consolidated for the purpose of the trial. At the conclusion of the trial the jury, by separate verdicts as to each victim, found the defendant guilty of murder in the first degree and fixed the penalty at death.

The defendant makes only one assignment of error, viz., that the court abused its discretion by denying the defendant's motion for a continuance. It is the contention of defendant that he should not have been compelled to go to trial on November 16, 1966, because at that particular time the entire public was inflamed and outraged by the mass murders that had taken place. He first cited the *Speck* case in Chicago where eight nurses had been murdered; next, the case that occurred at the University of Texas when a number of people were killed by a gunman. More particularly he contended that the killing of four women and a child at Mesa, Arizona, by one Robert Smith, had created an atmosphere whereby it was impossible for him to obtain a fair and impartial trial.

Defendant cites the case of Irvin v. Dodd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed. 2d 751 (1961) in support of his contention that he did not receive a fair trial. It should be pointed out, however, that the United States Supreme Court, in disposing of that case found a clear and convincing build-up of prejudice against the defendant upon the following facts: (1) the defendant's trial had gathered a lot of notoriety in a small community and there were many curbstone opinions expressed as to his guilt and recommended punishment; (2) a barrage of headlines, cartoons and pictures were unleashed against the defendant for six or seven months before the trial; (3) the defendant's background of prior offenses was extensively covered in the press; and (4) the press announced a confession by the defendant to all six murders.

An examination of the voir dire record in *Irvin* showed that almost 90% of the prospective jurors examined entertained some opinions as to defendant's guilt. Two-thirds of the jury were somewhat familiar with material facts in the case and were of the opinion that he was guilty. Some of the prospective jurors indicated it would take evidence to overcome their belief as to defendant's guilt. Notwithstanding this clear evidence of belief by the jurors in the defendant's guilt prior to trial, this standing alone was not sufficient to overcome the presumption of impartiality. The Court said:

"It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of

swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." 366 U.S. at 722–723, 81 S.Ct. at 1642.

 The rule established by *Irvin* is that the burden is on the defendant to demonstrate that prejudicial publicity reached members of the jury and that the jurors both formed and were unable to lay aside preconceived notions of the defendant's guilt. We fail to see in what way the case lends support to the defendant's position. The facts in the instant case are so dissimilar to *Irvin* that a comparison can hardly be made. The character and content of the publicity pertaining to the defendant is practically nil, and he makes no attempt to show that the jury formed any preconceived beliefs as to his guilt, or that they had in fact been exposed to any publicity regarding him.

More recent cases handed down by the United States Supreme Court seem to require that the defendant show only that a substantial segment of the community was exposed to information about him or his case, and demonstrate clearly the probability that the exposure created a hostile community atmosphere that prevented the jury from impartially evaluating the evidence. See Rideau v. State of Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); and

Sheppard v. Maxwell, 384 U.S. 333, 86 S. Ct. 1507, 16 L.Ed.2d 600 (1966). None of the above cited cases, however, have facts that are comparable or similar to the instant case. In *Rideau*, for example, the defendant had been filmed in the act of confessing to the crime and the film was shown on television in the community where his trial was to take place. In *Estes*, both the pre-trial and the trial were televised and re-broadcast. In *Sheppard*, a great deal of the enormous volume of publicity, both before and during the trial, had been leaked to the press by the police, county officials and district attorney's office.

An argument somewhat similar to the one in the instant case was made in United States v. Flynn, 216 F.2d 354 (2 Cir. 1954). There it was claimed that deep-seated feelings against the Communist Party and Communism generally made a fair trial impossible unless the case was continued indefinitely. In rejecting defendant's contention, Judge Harlan quoted extensively from an opinion by Judge Learned Hand in United States v. Dennis, 183 F.2d 201, 226 (2 Cir. 1950), among which was the following language:

" 'Next, it is urged that it was impossible in any event to get an impartial jury because of the heated public feeling against Communists. That such feeling did exist among many persons—probably a large majority—is indeed true; but there was no reason to suppose that it would subside by any delay which would not put off the trial indefinitely. The choice was between using the best means available to secure an impartial jury and letting the prosecution lapse. It was not as though the prejudice had been local, so that it could be cured by removal to another district; it was not as though it was temporary, so that there was any reasonable hope that with a reasonable continuance it would fade. Indeed, as it turns out, it is probable that the trial was at a less unpropitious time than any

that has succeeded it, or is likely to follow. Certainly we must spare no effort to secure an impartial panel; but those who may have in fact committed a crime cannot secure immunity because it is possible that the jurors who try them may not be exempt from the general feelings prevalent in the society in which they live; we must do as best we can with the means we have.'"

After examining the record before us in the instant case, we find no evidence that there was unnecessary publicity regarding the defendant's own murder case. In reference to the *Smith* murders that took place in Mesa on November 12, 1966, the defendant in the instant case made no showing whatsoever that the jurors or any of them who sat on his case were in any way prejudiced because of that or other murder cases then pending in Maricopa County. At the time of his motion for a new trial, the defendant produced a great number of clippings from the newspapers published in Maricopa County relating to the *Smith* case, but only one article dealing with the defendant and the crime he was alleged to have committed, and it was a moderate account of the trial court's denial of the defendant's motion for a continuance. It should be noted, also, that the instant murder occurred in a remote area in Maricopa County and did not involve people of prominence or notoriety. Similarly, no showing was made that the two mass murders occurring in Chicago and Texas several months prior to the trial of defendant produced any local prejudice against the defendant or precluded him from receiving a fair trial.

It is our opinion that the trial court did not abuse its discretion in refusing to grant the defendant a continuance. Its judgment is affirmed.

McFARLAND, C. J., and STRUCKMEYER, BERNSTEIN, and LOCKWOOD, JJ., concur.