**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Steven Ray KANDLIS, Defendant-**
**Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Julian Joseph ZEBROWSKI, Defendant-**
**Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**William Wilson QUINN, Jr., Defendant-**
**Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Larry Allen SLOCUM, Defendant-**
**Appellant.**

**Nos. 24775, 24783, 24784 and 25482.**

United States Court of Appeals,
Ninth Circuit.

May 28, 1970.

Rehearing Denied Aug. 12, 1970.

Joseph R. Schlozman, Kansas City, Mo. (argued for Steven R. Kandlis), James M. Sakrison, of Lesher, Scrugg, Rucker, Kimble & Lindamood, Tucson, Ariz.; John R. McDonald, of Deconcini & McDonald, Tucson, Ariz. (argued for Julian J. Zebrowski), James M. Sakrison, of Lesher, Scruggs, Rucker, Kimble & Lindamood, Tucson, Ariz. (argued for Wm. W. Quinn, Jr.), Leon Thikoll, of Thikoll & Johnston, Tucson, Ariz. (argued for Larry A. Slocum), for appellants.

James McLeod Wilkes (argued), Asst. U. S. Atty., Richard K. Burke, U. S. Atty., Jo Ann D. Diamos, Asst. U. S. Atty., of Tucson, Ariz., for appellee.

Before CHAMBERS, HAMLEY and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge:

The four appellants were each charged with violations of 21 U.S.C. § 176a and 26 U.S.C. § 4744(a). They were tried before a jury, found guilty on the 21 U.S.C. § 176a charge, and each was sentenced under the Youth Corrections Act. Their common contention is that the trial court erred in failing to suppress evidence that marihuana was found in the car in which they were riding, as

the product of an illegal search. We reverse.

Lukeville, Arizona is a tiny town on the Arizona-Mexico border next to the Organ Pipe Cactus National Monument, where state highway No. 85, coming from the north, reaches the border. The nearest town to the north of any size is Ajo, some forty miles away. The nearest Mexican town is Sonoita, two and one-half miles to the south. From there the road runs south and west to Puerto Penasco (also referred to as Rocky Point) on the Gulf of California, 65 miles away. Puerto Penasco is a fishing resort. On weekends a considerable number of vehicles cross the border en route to or from Puerto Penasco. Sonoita is reputed to have a population of 5,000, but the only business there that might attract American students is said to be a house of prostitution. There is a secondary road east from Sonoita to the main highway south and thence to such resorts as Guaymas and Mazatlan.

The permanent population of Lukeville is about 50. On winter or spring weekends, such as March 2, 1969, there are enough trailer campers in the town to more than double the population. There is one commercial building containing, among other things, a bar, and one gasoline service station. Some 60 feet from the border, and across the highway from the commercial building, is the United States border station. On March 2, 1969, there were two United States Customs inspectors and three Immigration inspectors, but no other law enforcement personnel in Lukeville. There is an eight foot cyclone fence at the border, but to the West it extends only a quarter of a mile. From thence West, there is a four strand barbed wire fence. The gate across the highway is locked at midnight.

Six miles to the north, and just off highway 85, is the headquarters of the National Monument. There are camping grounds at the headquarters, and on March 2, 1969, there were five tents and 225 trailers in the campgrounds, with an estimated total population of 568. For March 3, the figures were 1 tent, 203 trailers, and 503 people. From the highway to the campgrounds is about a mile and a half. There are many roads in and out, and they are never closed. Especially on weekends, a certain amount of evening "partying"—drinking beer and singing—goes on in the campgrounds. Hitchhikers are not uncommon along highway 85.

On Sunday, March 2, 1969, one of the appellants, Quinn, drove a car across the border from Mexico at Lukeville, at about 11:45 P.M. The United States border station was manned by Customs Inspector Chauncey Espe. Espe asked Quinn where he was going, and was told that Quinn was returning to Tucson, to the University of Arizona. Quinn did not have the registration papers for the car, which carried California license plates, and said that it belonged to a friend who had met other friends at Sonoita and was continuing on to Mazatlan with them. Espe then asked Quinn to open the car trunk. Quinn did so, and in a cursory search of the trunk Espe found two jackets of different weights, a piece of nylon rope, a pair of heavy boots, and a small packsack. He looked in the packsack, but saw nothing that he could remember.

Espe allowed Quinn to proceed. He locked the border gate at midnight and then called the sheriff's office at Ajo, by radio, and asked that Quinn's car be intercepted and that he be told how many people were in it. Espe noticed that Quinn's car was parked in front of the bar, and walked over and saw that Quinn was seated there alone. Espe returned to his office. He saw Quinn's car drive north at 12:25 A.M., but did not see whether there were other people in it. He radioed the sheriff that the car had left. He attempted no surveillance, because he would have had to do it on his own time and in his own car, which was at his house 100 yards away. He did, however, remain in his office playing solitaire while he awaited a call from the sheriff's office.

At about 2:15 A.M. sheriff's deputy Garchow stopped Quinn on highway 85, approximately 23 miles north of Lukeville. He informed Espe by radio that the car now held four persons. Espe requested that the car and occupants be detained until he arrived. Garchow told the occupants that they would have to wait for Espe and obtained Quinn's driver's license. Between this call and Espe's arrival, another patrol car arrived to support deputy Garchow. Both deputies were armed.

Espe reached the scene at about 2:50 A.M. He asked Quinn to get out of the car and demanded the keys, which Quinn handed to him. Espe also asked Quinn where he had picked up the three men, and was told that it was north of Lukeville. He then asked Quinn to open the trunk. Quinn tried to, but the keys did not fit. Next, Espe asked one of the other men in the car to get out and to open a suitcase that was between his feet. In it Espe found marihuana. All four men were told that they were arrested, and a subsequent search revealed more marihuana.

At oral argument the government properly conceded that the search in question was not a border search and therefore probable cause was needed for the search. See Plazola v. United States, 9 Cir., 1961, 291 F.2d 56, 61.

■ We need not decide precisely when the arrest occurred. It could have been when deputy sheriff Garchow stopped the car. (See, however, Wilson v. Porter, 9 Cir., 1966, 361 F.2d 412; Jackson v. United States, 9 Cir., 1970, 423 F.2d 506. It could have been when the deputy told the four men that they must wait, or when Espe arrived and demanded the car keys, or when the men were finally told that they were under arrest. Nor need we decide whether a customs agent can stop and search a car without arresting any of its occupants when he has probable cause to believe that it contains contraband. See Carroll v. United States, 1925, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543; Brinegar

v. United States, 1949, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879. Here, the arrest and search are inextricably intertwined. The officers could neither arrest nor search without probable cause; if they had probable cause, they could do both. The only question, then, is whether there was probable cause when Espe arrived and at once set about a search. Suspicion, with some grounds to support it, there undoubtedly was. But that is not enough. See United States v. Selby, 9 Cir., 1969, 407 F.2d 241.

If there was probable cause, it had to be based on Espe's knowledge; the sheriff's deputies merely did what he asked them to. Espe testified that there was nothing about the appearance of Quinn, or his car that was unusual. Quinn was not nervous or apprehensive. It is not unusual for someone to cross the border late at night, or even for a stranger to do so. There are probably as many, or more, cars crossing the border with California plates on them than cars with Arizona plates. The heaviest traffic from Mexico to Arizona is on a Sunday evening. March 2, 1969 was Sunday.

■ Espe, of course, knew all about the size and location of Lukeville, the places to and from which many people go and come when they cross the border, the characteristics of the traffic, and the character of the surrounding country, including the border fence, the National Monument and its campers, as we have described them in detail. He could take this knowledge into account.

Specifically, the facts about Quinn, which, according to Espe, aroused his suspicions at the border are these: 1. the hour at which Quinn arrived, 2. the fact that Quinn did not own the car, which Espe says is frequently the case with smugglers, 3. Quinn's story about his friend meeting other friends at Sonoita when Quinn said he was from Tucson, 4. the presence of the rope in the car trunk (Espe had never seen this type of

rope in any other car), 5. the lack of luggage in the car, and 6. Espe's knowledge of two other cases during the preceding year in which a driver crossed the border alone, with no contraband, and later picked up others, who had crossed the border on foot through the barbed wire fence, carrying contraband. Espe defined his then state of mind as one of strong suspicion.

■ When he asked the deputy sheriff to hold the car, and when he began the search, Espe knew two things, and only two things, more: there were now four people in the car, and it had taken the car nearly 2 hours to go 23 miles up the highway from the border. He did not know that the keys would not open the trunk; he did not know about the suitcase on the car floor or its contents. These he learned after he began his search. One cannot acquire probable cause by a search that one did not have probable cause to begin. Henry v. United States, 1959, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134.

We are of the opinion that while the two additional facts known to Espe could certainly heighten suspicion, they are not enough, taken with what he already knew, to amount to probable cause. Probable cause is determined by examining " * * * whether at that moment the facts and circumstances within their (the authorities) knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." Beck v. Ohio, 1964, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142.

Here, as in United States v. Selby, *supra,* Espe's " * * * information is susceptible to a variety of credible interpretations not necessarily compatible with nefarious activities." (407 F.2d at 243). Everything Espe knew was compatible with innocence. When Quinn crossed the border, all the appearances were consistent with innocence; at most

they led Espe to think that Quinn might be going to do something unlawful. Quinn's slow progress, and his acquisition of passengers, are susceptible of a variety of credible, innocent interpretations. Thus he could have stopped along the road to rest; he could have picked up three hitchhikers; he could have driven into the Monument campgrounds, joined a party and picked up his companions there. Those companions might never have been in Mexico. Even if they had been, they might not have carried contraband. In short, we conclude that what Espe knew was enough for suspicion, but not enough for probable cause.

Reversed.

CHAMBERS, Circuit Judge (dissenting):

Rocky Point (Puerto Penasco), Sonora, is a little fishing village. Most of the travel in Sonora in and out of Lukeville is to Rocky Point. Between Lukeville-Sonoita and Rocky Point there is nothing but cattle country. At Rocky Point there is the fishing camp and an interesting water desalting plant. As Quinn passed into Arizona, there was no indication that he had been fishing, had gone to Rocky Point to inspect the desalting plant, that he had been studying the geological formations south of Lukeville, or attending the cattle of the region. There was no reason to believe he had been visiting residents of Mexico in Sonoita.

Quinn's loitering at the Lukeville bar alone for about 45 minutes at midnight before proceeding northward was a very, very suspicious circumstance which justified further inquiry.

When the car was stopped at 2:15 a.m., one hour and 50 minutes later, and he was found with three new companions and a suitcase in the passenger area of the car, obviously visible from outside the car, I think there was probable cause to believe that Quinn had picked up confederates (smugglers) who had walked

across the line east or west of Lukeville with their wares, avoiding inspection at the Lukeville gate. It was obvious that they already had known each other.

Given the same facts as we have here, I would guess that 99 out of 100 times one would find smuggled contraband. I would say that is enough for probable cause. The majority just fails to take into account the utter loneliness of the area. As I see it, the majority applies a rule we would apply if Quinn's crossing had occurred at San Diego and his car had been stopped again 23 miles north, all in an urbanized area. In such a crossing, the innocent things the later acquired passengers could have been doing would be limitless.

It taxes my imagination to believe that Quinn's passengers could reasonably have been thought to have been picked up as plain hitchhikers on Highway 85 at about 1:30 a.m. with a suitcase or that Quinn had picked them up over at the national monument campground at that time of night after a harmless visit or that there was any other innocent probability.

Absolute certainty is not required. Thus, I dissent.

## ORDER

PER CURIAM.

The petition for a rehearing is denied. Judge Chambers voted in favor of a rehearing.

Pursuant to Rule 35(b) of the Federal Rules of Appellate Procedure, and to the request of Judge Chambers, the suggestion that the case be reheard by the court sitting in banc was transmitted to all of the judges of the court who are in regular active service. A majority of the court voted to reject the suggestion of a hearing in banc. Judges Chambers and Carter desire to have their votes in favor of a rehearing in banc recorded. The suggestion of a rehearing in banc is rejected.