506 P.2d 248

**STATE of Arizona, Appellee,**

v.

**Robert Dean ENDRESON, Appellant.**

**No. 2060.**

Supreme Court of Arizona,
In Banc.

Feb. 5, 1973.

Gary K. Nelson, Atty. Gen., Albert M. Coury, Former Asst. Atty. Gen., William P. Dixon, Asst. Atty. Gen., Phoenix, for appellee.

O. J. Wilkinson, Jr., Phoenix, for appellant.

LOCKWOOD, Justice:

This is an appeal from a verdict and judgment of guilt to the crime of murder in the first degree (A.R.S. §§ 13–451, 13–452, 13–453).

We are called upon to determine:

1. Whether the motion to suppress evidence was improperly denied.

2. Whether the motion to suppress statements made by the defendant was improperly denied.

3. Whether the motions for change of venue were improperly denied.

4. Whether the motion for mistrial based upon improper voir dire by the County Attorney was improperly denied.

The pertinent facts are that the defendant, Robert Dean Endreson, was convicted on March 20, 1969 of the March 12, 1968 murder of Linda Hodge. On March 22, 1968, Officer David Arrelanes, of the Maricopa County Sheriff's Office, procured a warrant to search defendant's residence and car based upon an affidavit

presented to Justice of the Peace Stanley Kimball.[1] They proceeded to search the premises and vehicle on that same day and found bowling shoes, tags from bowling bags, a blue scarf, a zippo lighter and several keys belonging to the victim.

Further, on the evening of March 22, 1968, several law enforcement officials, consisting of members of the Maricopa County Sheriff's Office, the Phoenix Police Department, the Maricopa County Attorney's Office and two psychiatrists visited defendant at the federal detention center in Florence, Arizona. Officers Calles and Ysasi questioned the defendant alone for two and one half hours regarding the

---

1. The affidavit supporting the search warrant issued on March 22, 1968 states in part:

That on March 12, 1968, affiant personally observed that one Linda Hodge was shot six (6) times and murdered by an unknown assailant in the area of 150th Street and Shea Blvd. in the County of Maricopa, State of Arizona.

That subsequently an autopsy was performed on said Linda Hodge and affiant was informed of the matters set forth in Exhibit "B" attached hereto and incorporated herein by reference.

That subsequently affiant was informed by Captain Jack Watson, of M.C.S.O., that six bullets found in the dead body of said Linda Hodge were .38 cal. bullets, weighed 148 grains each and have seven lands and grooves to the right.

That affiant was informed by an expert criminalist that the aforementioned description of said bullets are isolated to "Webley" and "Enfield" revolvers and therefore, are somewhat rare.

That affiant was informed by Sgt. John Fields, of the Phoenix Police Department, that a white motor vehicle was seen leaving the scene of a shooting incident on March 9, 1968, in the same proximity where said Linda Hodge was last seen alive and her vehicle found abandoned; that the bullets involved are comparable to those fired by a "Webley" or "Enfield" revolver.

That on March 22, 1968, affiant was informed by said Sgt. John Fields that he had learned from the Motor Vehicle Dept. of the State of Arizona that a 1963 Mercury bearing Arizona license No. HSB-163 is registered to one ROBERT DEAN ENDRESON, and that a white vehicle of the same description was seen on today's date at 29 West Coolidge, Maricopa County, State of Arizona.

That affiant was informed by said Sgt. John Fields and by Marvin C. Morrisett, Deputy U.S. Marshall, that on 3-21-68 said Marvin C. Morrisett went to 29 West Coolidge, County of Maricopa, State of Arizona, found said Robert Dean Endreson to be living at said address, the above described vehicle being located at said address, that said Robert Dean Endreson was then arrested by said Marvin C. Morrisett on a Federal warrant of arrest; that said Robert Dean Endreson was taken into custody and found to have a loaded "Enfield" .38 cal. revolver in his possession.

That on 3-22-68 affiant was informed by said Sgt. John Fields that the above mentioned revolver was given to one Joe Collier, a Criminalist with the Phoenix Police Department, who has testified as an expert Criminalist in the Superior Court of the State of Arizona, and that in the opinion of said Joe Collier, the bullets found in the body of Sylvia Presley were fired from the revolver found in the possession of said Robert Dean Endreson, and that the bullets are also comparable to those found in the dead body of said Linda Hodge.

That affiant has been informed by the husband of said Linda Hodge, Bud Hodge, that the aforementioned bowling balls, bowling bags, and bowling shoes were in the vehicle driven by said Linda Hodge immediately before her death, and that said property is no longer in the vehicle. That when said Linda Hodge was last seen by her husband, the aforementioned scarf and cigarette lighter were in her possession and that said property was not found to be in her possession by affiant on 3-12-68; that the keys described in Exhibit "A" attached hereto and incorporated by reference herein are the same keys that were in the possession of said Linda Hodge when she was last seen by her husband, said exhibit being made from copies of the keys supplied to affiant by said Bud Hodge.

That affiant was informed on 3-22-68 by said Sgt. John Fields that Hugh Thornhill, a fingerprint expert with the Phoenix Police Department Identification Bureau who has testified as a fingerprint expert in the Superior Court of the State of Arizona, stated that the fingerprints on file at the M.C.S.O. Identification Bureau for one Robert Dean Endreson is similar to a fingerprint found in the vehicle of said Linda Hodge by a Deputy Sheriff, and that said fingerprint cannot be excluded as not being left by said Robert Dean Endreson.

murder of Linda Hodge. No counsel for the defendant was present or requested at this time. However, Officer Calles testified that the defendant was read his Miranda rights before the discussion commenced, and said he understood them and signed the card. The officers took notes on the interview which were later made a part of the official report. During this period of questioning, the defendant admitted killing Linda Hodge.

The defendant's motion to suppress both the items seized under the March 22 search warrant and the statements made by the defendant on the same day, were denied by the trial court.

Continuously, from the time Linda Hodge's body was discovered to the eve of the trial, the news media in the Phoenix area carried items concerning the defendant and his alleged victims, (Linda Hodge and another woman found slain in a convenience market.) As a result of this publicity, counsel for the defendant filed several applications for removal of the action to another county. The defendant's motions for change of venue were all denied by the trial court.

During individual voir dire some jurors did remember the case from the news media. Some, who connected the defendant with the convenience market incident were automatically excused. Of the twelve jurors finally empaneled, six of them admitted having preknowledge of the case through the news media, but stated they could base any verdict solely on the evidence presented.

Moreover, the Deputy County Attorney, representing the State, in his voir dire questions to the prospective jurors, consistently asked whether the individual jurors could give the death penalty under the specific circumstances of this case and whether they could follow the instruction by the court to weigh equally both sides, laymen and psychiatrists, regarding the sanity of the defendant. However, the issue of insanity was never raised during the trial. Of the twelve jurors who ultimately sat on the case, ten were asked at least one of these questions (regarding insanity or the death penalty). At the conclusion of all voir dire, the defendant moved for a mistrial, which was denied by the trial court.

## SHOULD THE MOTION TO SUPPRESS EVIDENCE HAVE BEEN GRANTED?

The question presented is whether probable cause existed from the officer's affidavit for the magistrate to issue a search warrant under A.R.S. §§ 13–1443 and 13–1444, subsec. B (1956).

The defendant, relying heavily upon Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142, 145 (1964); Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); United States v. Kandlis, 432 F.2d 132, 135 (9th Cir. 1970), contends that the facts set forth in the affidavit were insufficient to provide the magistrate with probable cause to issue a warrant. Those cases employed a reasonable man test for probable cause. It must be noted, however, that in each of those cases where the test was not satisfied, there was a search without a warrant. Here there was a warrant based on a police officer's affidavit.

 It is well settled that where a search is based upon a magistrate's rather than a police officer's determination of probable cause, the reviewing court will accept evidence of a less judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant, and will sustain the judicial determination of probable cause so long as there was substantial basis for that conclusion. Aguilar v. Texas, 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L. Ed.2d 723, 726 (1964); Jones v. United States, 362 U.S. 257, 270–271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697, 708 (1960). Moreover, there is a presumption in favor of the validity of a search warrant. State v. Kelly, 99 Ariz. 136, 140, 407 P.2d 95, 97 (1965).

 As a result, we feel that the affidavit in the instant case, not only was inter-

preted in a realistic fashion, United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), but complies with the well known requirements of Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) and Aguilar v. Texas, *supra*. Therefore, we hold that the trial judge in the instant case did not abuse his discretion by denying the motion to suppress, since probable cause existed based on the affidavit of Officer Arrellanes. See State v. Boyer, 106 Ariz. 32, 470 P.2d 439 (1970). Further, the affidavit indicated that there would be certain items belonging to the victim that would constitute evidence of the murder. It is well known that:

> "The situation here does not differ markedly from other cases wherein this court and others, albeit usually without discussion, have upheld searches although the nexus between the items to be seized and the place to be searched rested not on direct observation, as in the normal search-and-seizure case, but on the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property." United States v. Lucarz, 430 F.2d 1051, 1055 (9th Cir. 1970).

See United States v. Teller, 412 F.2d 374, 377–378 (7th Cir. 1969), cert. denied, 402 U.S. 949, 91 S.Ct. 1603, 1604, 29 L.Ed.2d 118 (1971); Aron v. United States, 382 F.2d 965, 971 (8th Cir. 1967); Porter v. United States, 335 F.2d 602, (9th Cir. 1964), cert. denied, 379 U.S. 983, 85 S.Ct. 695, 13 L.Ed.2d 574 (1965).

## SHOULD THE MOTION TO SUPPRESS STATEMENTS OF DEFENDANT HAVE BEEN GRANTED?

It should not have been granted. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–1197, 10 L.Ed.2d 215, 218 (1963).

In the instant case, it is true that the officers deleted several statements made by the defendant. The defendant, however, makes no offer of proof regarding what was missing nor whether the omissions were material to proving his innocence.

As we said in State v. Maloney, 105 Ariz. 348, 464 P.2d 793, cert. denied, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 75 (1970), "[t]he fact that defendant here may have been harmed by the failure to preserve this evidence is not enough. An erroneous admission of evidence by a trial court or a bad interpretation of a state law, without more, would not raise a constitutional issue, although both errors might harm the defendant." 105 Ariz. at 352, 464 P.2d at 797.

## SHOULD CHANGE OF VENUE HAVE BEEN GRANTED?

The defendant Endreson's alleged slayings received extensive coverage by the news media, which continued from the time Linda Hodge's body was found through the time of trial.

It is well settled that a change of venue is not granted as a matter of right; it is within the sound discretion of the trial judge, and his ruling will not be disturbed on appeal unless a clear abuse of discretion appears and is shown to be prejudicial to defendant. State v. Schmid, 107 Ariz. 191, 193, 484 P.2d 187, 189 (1971); State v. Narten, 99 Ariz. 116, 407 P.2d 81 (1965), cert. denied, 384 U.S. 1008, 86 S.Ct. 1985, 16 L.Ed.2d 1021 (1966); State v. Woolery, 93 Ariz. 76, 378 P.2d 751 (1963); State v. McGee, 91 Ariz. 101, 370 P.2d 261, cert. denied, 371 U.S. 844, 83 S.Ct. 75, 9 L.Ed.2d 79 (1962).

In support of defendant's contention that the trial judge abused his discretion in denying defendant's motions the following cases were cited: Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16

L.Ed.2d 600 (1966); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); Marshall v. United States, 360 U. S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). We disagree and find the case of State v. Schmid, *supra,* controlling. We find that none of the prejudicial factors in the cases cited are present in the instant case. The accused's trial did not have a "carnival-like atmosphere", nor was the accused faced with a prospective jury 90% of whom had already formed an opinion regarding his guilt.

Moreover, Rule 220, Rules of Criminal Procedure, 17 A.R.S. expressly provides that the fact that a person, called as a juror, "has formed an opinion or impression based * * * upon news reports, about the truth of which he has expressed no opinion shall not disqualify him to serve as a juror in such action, if he upon oath states that he believes he can fairly and impartially render a verdict therein in accordance with the law and the evidence, and the court is satisfied with the truth of such statement."

In the instant case the trial judge asked each prospective juror individually whether he had seen or heard any publicity relating to the defendant. If the prospective juror answered "yes" the Judge then inquired what he remembered. If the prospective juror mentioned a Circle K or second murder, he or she was automatically excused. On the other hand, if the prospective juror recited facts that related only to the Hodge murder, the Judge then inquired whether the juror could be impartial. If, and only if the juror affirmed that he could be impartial, did the Judge even allow continuance of the voir dire.

Although the defendant correctly notes that he has the burden to demonstrate that prejudicial publicity reached members of the jury and that the jurors both formed and were unable to lay aside preconceived notions of the defendant's guilt, State v. Miles, 103 Ariz. 291, 440 P.2d 911 (1968), we feel that he did not meet this burden. There was no showing that the character of the publicity was inflammatory nor that the jury formed any preconceived beliefs regarding his guilt.

Hence, the trial judge did not abuse his discretion by denying defendant's motions for change of venue.

## SHOULD THE MOTION FOR MISTRIAL HAVE BEEN GRANTED?

The defendant also contends that the County Attorney asked the venire men several questions which were highly prejudicial to the defense and therefore the trial court abused its discretion in not granting the mistrial. One question dealt with the prospective juror's feelings regarding imposition of the death penalty.

■ As the defendant points out, the purpose of the examination of jurors on voir dire is to determine the real state of their minds so that a jury may be chosen which would impartially and fairly try all of the issues. Young v. State, 38 Ariz. 298, 304–305, 299 P. 682, 685 (1931). Moreover, the extent of examination must necessarily be left to the sound discretion of the trial court to determine the presence or absence of bias and prejudice. State v. Lovell, 97 Ariz. 269, 399 P.2d 674 (1965); State v. Wallace, 83 Ariz. 220, 319 P.2d 529 (1957); Wilson v. Wiggins, 54 Ariz. 240, 94 P.2d 870 (1939).

■ We have approved of the examination of jurors regarding possible scruples against capital punishment. State v. Woolery, *supra.* We, therefore, find no abuse of discretion in the denial of a mistrial because of the question regarding the death penalty.

■ The other question which the defendant felt was prejudicial, concerned the weight given to the testimony of laymen and psychiatrists on the issue of insanity. The defense contends that such a question was improper because the insanity of the defendant was never raised at trial. We disagree.

■ It is well settled that a defendant who invited error at trial may not then assign the same as error on appeal. State v.

Gilreath, 107 Ariz. 318, 487 P:2d 385 (1971), cert. denied, 406 U.S. 921, 92 S.Ct. 1781, 32 L.Ed.2d 121 (1972); State v. Arriola, 99 Ariz. 332, 409 P.2d 37 (1965); State v. Farmer, 97 Ariz. 348, 400 P.2d 580 (1965); State v. Rascon, 97 Ariz. 336, 400 P.2d 330 (1965).

In the instant case it was the defendant's counsel and not the county attorney who first asked questions on insanity.

 Further, when the defense moved for a mistrial, the grounds did not include the question on insanity. The rule is that the failure of counsel to object constitutes a waiver and provides no basis for appeal. State v. Gilreath, *supra.*

### DEATH PENALTY

Not raised by the defendant on appeal but directly in issue is whether the death penalty may be given in this case.

Endreson was sentenced to death pursuant to A.R.S. § 13–453, subsec. A (1956). That statute provides:

"A person guilty of murder in the first degree shall suffer death or imprisonment in the state prison for life, at the discretion of the jury trying the person charged therewith, or upon a plea of guilty, the court shall determine the punishment."

The Supreme Court of the United States vacated the judgments of several Arizona cases in memorandum opinions wherein the imposition of the death penalty remained undisturbed, on the grounds it was proscribed as cruel and unusual punishment by the Eighth and Fourteenth Amendments, citing Stewart v. Massachusetts, 408 U.S. 845, 92 S.Ct. 2845, 33 L.Ed.2d 744 (1972).

 In view of the foregoing, we hold that the death penalty provisions of A.R.S. § 13–453, subsec. A are unconstitutional. Although the conviction stands affirmed, pursuant to A.R.S. § 13–1717, subsec. B (1956) the sentence is hereby reduced to life imprisonment.

HAYS, C. J., CAMERON, V. C. J., and STRUCKMEYER and HOLOHAN, JJ., concur.