720 P.2d 94

**The STATE of Arizona, Appellee,**

**v.**

**Paul Phillip LINDSEY, Jr., Appellant.**

**No. 2 CA–CR 3600.**

Court of Appeals of Arizona,
Division 1, Department A.

Oct. 3, 1985.

**494**

Robert K. Corbin, Atty. Gen. by Galen Wilkes, Tucson, for appellee.

Frederic J. Dardis, Pima County Public Defender by Frank P. Leto, Tucson, for appellant.

OPINION

BIRDSALL, Presiding Judge.

The appellant was found guilty by a jury of two counts of incest and six counts of sexual exploitation of a minor. The victim in all counts was his daughter, April. The first incest count was treated as nonrepetitive; the second as repetitive with one prior; and the other six as repetitive with two priors. The priors were alleged pursuant to A.R.S. § 13–604(H). A verdict was directed on one other charge of child molestation. The sentences were all aggravated but concurrent with one another. The longest sentences were for 21 years.

The appellant presents the following issues on appeal:

1) whether the trial court's failure to limit the state's expert as to the credibility of incest victims and as to the identity of the perpetrator of the sexual abuse denied appellant the right to a fair trial;

2) whether the failure of the trial court to admit evidence of the complainant's sexual activity and to grant appellant's motion for new trial denied appellant the right to a fair trial and the right to cross-examination;

3) whether the introduction by the state of evidence concerning alleged other bad acts of the appellant was reversible error; and

4) whether the closing argument of the prosecutor contained improper remarks which denied appellant the right to a fair trial.

We affirm.

The victim, April, was born January 14, 1964. The appellant, her natural father, and her mother separated and she lived with her mother in Washington until she was 12. Her mother died and she then lived with her maternal grandparents, also in Washington, until she was 14. At that age and time she learned her father lived in Arizona and asked him if she could come live with him. He agreed and brought her to Arizona in July 1978. The appellant, a Pima County deputy sheriff, had remarried

and lived in a trailer home in Marana. The victim was given a room in a second, guest trailer on the premises.

Several months after April came to live with him, the appellant had intercourse with her. This continued on a regular basis until November 1981. April resisted at first but, since it did no good, she stopped resisting. She did not tell anyone because she thought it was her fault and she was ashamed. Also, the appellant threatened to take her to "juvenile" if she told. She was afraid of him. At times she loved him, hated him, and felt sorry for him.

When she was 15, the appellant began taking pictures of her in provocative poses and states of undress. These photos were proof of the conduct charged in the six counts of sexual exploitation.

April became pregnant in August 1979 and the fetus was aborted in November. After that, the appellant gave her birth control pills.

In August 1981, April began dating Mike Harris and they were subsequently married August 4, 1982. One week later she told her husband that the appellant had raped her once. In November 1983, April's sister, Rita, came to visit. Harris asked April, in front of Rita, if Rita knew about the incest. Then April told Rita about the appellant's conduct and the abortion. In turn, Rita then called the appellant's wife, Myra, and told her the entire sordid story. April and Myra then discussed the matter and April asked Myra to look for the pictures. Myra found them in a locked closet in the appellant's radio room in the guest trailer. The appellant had also taken similar photos of her, including one in the nude. Later the police also found two similar photos of the appellant's former wife, Faye. Myra reported everything to the police and filed for a divorce. By that time the appellant had a new 20-year-old girlfriend.

We will refer to other evidence when necessary to our discussion of the issues.

## THE EXPERT WITNESS

■ The initial question—whether the trial court should have permitted expert testimony on the subject of child molestation in general—must be answered in the affirmative. Our supreme court has said that expert testimony is admissible if it will assist the jury to understand the evidence or to determine a fact in issue. *State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208 (1983). Rule 702, Arizona Rules of Evidence, 17A A.R.S. (1984 Supp.). If the subject is one of such common knowledge that people of ordinary education could reach as intelligent a conclusion as the witness then it should not be a subject for such expert testimony. *State v. Owens*, 112 Ariz. 223, 540 P.2d 695 (1975). See also *State v. Gonzales*, 140 Ariz. 349, 681 P.2d 1368 (1984). See also *State v. Huey*, 145 Ariz. 59, 699 P.2d 1290 (1985). In *Huey*, our supreme court held that expert testimony of the "rape trauma syndrome," although inadmissible to prove a rape had occurred, was admissible to prove the victim's lack of consent. See also *State v. Moran*, Ariz. (2 CA-CR 3827, filed September 18, 1985) (expert testimony admitted concerning frequency of recantation by victims of in-home child molestation).

It is abundantly clear from the testimony of the psychologist in this case that the subject of child molestation, particularly within the family setting, is not one of common knowledge. Thus, the psychologist, Dr. Jean Baker, testified that certain behavior is commonly exhibited by victims of in-home incestuous-type molesting. She listed the following common behavior patterns:

1) angry, rebellious behavior, which may involve overtly delinquent activities, such as drug use, promiscuity, or stealing;

2) self-destructive tendencies, either indirectly in the sense of drug abuse or getting into dangerous situations with males, or suicidal;

3) runaway behavior (research suggests that up to 80 per cent of runaways have

been abused sexually or in some other way);

4) school problems, including a lot of absence from school, problems with peer relationships, and getting along with people;

5) conflict with the family, which might include acting out against the mother or anger at the father; and

6) problems with self-image, feelings of worthlessness.

Dr. Baker then described some of the conflicting emotions going on in the child which leave the child confused and unsettled. The children often fall into one of two extremes: they intensely hate their father, or they are completely tied to and dependent on their father. Usually, however, the child's feelings are more ambivalent, feeling one way one time and another way another time. For example, children may feel intense anger at the parent at the same time they feel very attached to the parent. Sometimes they feel guilty for what's happening, blaming themselves. And sometimes they really enjoy the sex act at the same time they are repelled by it.

Asked if it is unusual that the incestuous conduct is kept secret from immediate family members as well as people outside the home, Dr. Baker responded: "... it's usually a secret from everyone except the two that are participating.... That's the power of this whole thing that it is such a secretive kind of thing."

While it is rare that a molestation is revealed during childhood, Dr. Baker has found in her private practice that "it's not an uncommon thing at all for adult women when they're in therapy to bring up issues of molestation while they were children.... Some people never reveal it to anyone."

Asked why the children aren't telling anyone, Dr. Baker said there were several reasons. First, "they're afraid they won't be believed. The father may be someone with high status in the community, may be someone that no one would typically believe would do such a thing." Second, they often blame themselves and think they're

responsible. Third, they may be afraid of what will happen to them. Sometimes children are threatened, either actually or impliedly, with harm if they do tell. Finally, "[t]here's that feeling of pity and not wanting anything bad to happen to the father, and there's just the general need of a child for the security of the parental approval and not wanting to risk that."

Despite the fact that children may have more reason for not telling than for telling, the belief persists that if in fact this kind of behavior were going on, the victim would tell someone.

"I think that's the general kind of—what in this field is called a myth, that kids would not let something like this happen to them without telling.

There's a belief that why would any child go along with this? Why wouldn't they tell? And it seems like that is kind of taken as proof that couldn't have happened or the child would have told while it was going on.

But that just isn't the case. That doesn't take into account the extreme differential say in power between the child and the parent. And the parent is the trusted figure for the child, and if the parent is saying this is right, and this is what you should do, it's very hard for the child to counter that."

Dr. Baker was then asked if, based on her work with the Child Protective Services as well as her training and reading of the literature, if she had an opinion as to what proportion of victims in these sorts of cases are lying, making it up.

"Well, there aren't too many statistics on that. The one statistic that I have found came from ... one of the demonstration projects in the nation for treating incestuous families.

It's one of the most respected programs and one of the first that really started treating families as a group. And their figures were that it was possibly one percent that lied. But I don't know that that's totally accurate. But in general, most people in the field feel that it's a very small proportion that lie."

The trial court determined Dr. Baker was qualified to testify because she had practiced in Tucson as a clinical psychologist for fourteen years. She had a private practice where she saw patients in her office and a consulting practice. She consulted with both Child Protective Services of the Arizona Department of Economic Security and Parents Anonymous, a national organization. With Child Protective Services she consulted directly with the caseworkers, making decisions and plans on specific cases. She also did psychological evaluations of child victims and has seen over 100 victims, mostly in a family-type situation.

Prior to trial, appellant's trial counsel (he is now represented by different counsel on appeal) objected to the use of such expert testimony because it would invade the province of the jury. He argued that its purpose was to tell the jury that the victim, April, was telling the truth. We believe this objection is the fear expressed in the dissenting opinion of Justice Hays in State v. Chapple, supra, and his concurring opinion in State v. Gonzales, supra. Although we are, respectfully, inclined to agree with Justice Hays' concerns, we believe our supreme court has rejected these views and we are bound to follow its direction.

■ The trial court ruled that the expert testimony would be permitted, but the state would be limited in direct to questions about the "problem in general or as it might affect a substantial portion of the population rather than tying it into the facts—the alleged facts of this particular case." The trial judge then cautioned that "depending on how the defense was conducted, why it may very well open the door for the state to go into—to zero in more on this particular case...."

As might be expected, this is exactly what happened. Following Dr. Baker's direct testimony, defense counsel conducted an excellent, searching, cross-examination, but in doing so clearly made it logically necessary for the prosecutor to ask Dr. Baker, as had defense counsel, about the facts of the case. The only question which appears to us to directly usurp the jury's function follows:

"Q When you look at this case, and obviously you could never do enough work on any case, but when you look at the information you have had and even the things Mr. Cooper [defense counsel] has told you today, can you reach an opinion as to whether you feel that April Harris is consistent with someone who had been sexually abused by living at home by her father?

A Yes, in my opinion.

Q Okay. What is your opinion as to whether—that there is consistency there?

A I think the likelihood is very strong. I would feel stronger if I had seen all parties and been involved in evaluating them. But based on what I have, I feel there's a preponderance of the evidence here.

Q Okay.

A No one specific thing, but taking it all together.

Q Do you think it's pretty strong indication or just kind of moderate?

MR. COOPER: Judge, I think she just answered the question.

THE COURT: No, overruled, go ahead.

THE WITNESS: I think it's fairly strong."

Aside from the preliminary motion which we have discussed, there was no objection to any of the expert testimony. In fact, during much of the cross-examination, defense counsel utilized excerpts from a book, "Broken Taboo," written by two psychiatrists from the University of Texas, which Dr. Baker recognized as authoritative in the field. Although we are hesitant to rely upon the doctrine of waiver, we believe that the appellant's counsel did open the door and cannot now claim on appeal that the redirect testimony of the expert constituted reversible error.

VICTIM'S SEXUAL CONDUCT

■ The appellant sought to prove that the victim had sex with other men to over-

**498**

come the inference that he was the father of her child. A hearing was held pursuant to *State ex rel. Pope v. Superior Court*, 113 Ariz. 22, 545 P.2d 946 (1976). No evidence in that hearing tended to show that the victim had intercourse with anyone except the appellant during the time of conception. Any sex with other boys or men was several weeks or months after her pregnancy, or long before. We find *Pope* controlling on this issue and reject the appellant's other arguments concerning right of cross-examination, showing of motive by cross-examination, and bias and prejudice of the witness.

■■ In the motion for new trial, the appellant argued that affidavits of two potential witnesses concerning sexual conduct of April and other nude photos taken of April were newly discovered evidence entitling him to a new trial. Assuming, arguendo, that the evidence was newly discovered, there is no showing as to one of the witnesses that it could not have been discovered with due diligence before trial. The other affiant, a young girl living with the appellant at the time, said she did not tell because her father was ill and she did not want to hurt him. The trial court could have disbelieved her. All of the "new" evidence would go toward impeachment only. We have examined the affidavits and believe the trial court could properly have concluded that such evidence would not have changed the jury's verdicts. Rules 24.2 and 32.1(e), Rules of Criminal Procedure, 17 A.R.S. The trial court, having heard the evidence in the trial and seen the witnesses, has a wide range of discretion in deciding a motion for new trial on the grounds urged. *State v. Jones*, 125 Ariz. 417, 610 P.2d 51 (1980); *State v. Jeffers*, 135 Ariz. 404, 661 P.2d 1105, *cert. denied*, 464 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983).

## OTHER BAD ACTS

■ The other bad acts which the appellant contends should not have been admitted were:

1) nude or semi-nude photos of his former wife, Faye;

2) testimony that the appellant took similar photos of his wife, Myra; and

3) testimony of Michael Harris that the appellant assaulted him with a gun.

Rule 404(b), Arizona Rules of Evidence, 17A A.R.S. (1984 Supp.) provides:

"Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

In *State v. Via*, 146 Ariz. 108, 704 P.2d 238 (1985), our supreme court noted that this list of relevant purposes for which evidence of other bad acts could be admitted is not exhaustive and that if offered for a non-character purpose, the evidence is admissible. The reason behind the rule is expressed in many Arizona decisions. *See State v. Treadaway*, 116 Ariz. 163, 568 P.2d 1061 (1977). The jury can conclude the defendant is a bad person and convict on lesser evidence because of this prejudice.

We agree with the appellee that the possession of the photos of Faye and the taking of the photos of Myra tend to corroborate April's testimony that he took such photos of her. We believe they are evidence of common scheme or plan. The appellant photographed or kept photographs of the women with whom he had sexual relations.

■ The testimony concerning the assault came in a non-responsive answer of Mike Harris. He was asked:

"Q And from the time April turned eighteen to the time you got married, did you have anything to do with her father?

A. Well, we drove out in that neighborhood one time and he chased us down or shot at us, or shot in the air."

There was no motion to strike this testimony unless it was made at an unreported

bench conference immediately following. However, we believe it was arguably relevant and, if error, harmless. There was other evidence showing that appellant was jealous and overprotective of April. This was further evidence of those feelings. It was only one answer in an eight-day jury trial, and does not appear to be so prejudicial that reversal is required.

## PROSECUTOR'S CLOSING ARGUMENT

 We consider this issue in light of the recent pronouncement of our supreme court that the appellant has the burden of demonstrating the conduct denied him a fair trial. He is denied a fair trial if there is a reasonable likelihood the misconduct could have affected the verdict. Whether this test is satisfied is left to the sound discretion of the trial judge. *State v. Bracy*, 145 Ariz. 520, 703 P.2d 464 (1985).

The first alleged instance of misconduct was the prosecutor's rebuttal of defense counsel's suggestion that the jury put themselves in the position of the defendant and try to remember what they were doing in 1978. The prosecutor did not object to that argument, but in rebuttal told the jury the argument was improper, that they were not supposed to put themselves in his position. We believe that defense counsel was arguing it is hard to recall events of six years ago. That argument is proper, although the way defense counsel argued the proposition was rather strange. Assuming the prosecutor's argument was misconduct, we do not believe it to be a ground for reversal.

 The second alleged misconduct occurred because the appellant had testified another man was the father of her child. The prosecutor asked the jury to consider why defense counsel had not asked April who was the father. In view of the ruling, pursuant to Pope, supra, the appellant claims this was misconduct. We believe the argument was permissible because it was defense counsel in his direct examination of the appellant who first opened the subject. If there was error, it was invited.

See *State v. Endreson*, 109 Ariz. 117, 506 P.2d 248 (1973).

 There was no objection to the other two remaining alleged improper statements and any error has been waived. Neither rises to fundamental error.

The trial court did not find these matters which were raised in the Rule 24 motion would have changed the verdicts. We find no abuse in that ruling.

We affirm the judgment of convictions and sentences.

HOWARD and FERNANDEZ, JJ., concur.